First case is NetTalk.com v. magicJack. You've reserved five minutes, Mr. Wu. Yes, Your Honor. Please proceed. May it please the Court. The District Court failed to weigh, under the Totality of Circumstances test, the facts that the District Court itself found. The District Court found that NetTalk's $200 million damages claim was based on provisional rights going back to 2009, and that those rights exist only if the issue claims are substantially identical to the provisional claims. Can I ask you about the portion of your argument about fees that you just began with about the damages claim? What did you explain, either here or to the District Court, about what you would have done differently, concretely, in preparing the litigation if, instead of believing that you might be on the hook for $200 million, you were going to only be on the hook for, I'm going to make up a number, I don't know what the number is, $30 million? Would you have lessened your efforts on liability, or what? Well, all of the reporters who report on the cost of patent litigation say that the cost of that litigation is proportionate to the amount in controversy. Wait, wait, wait. You're right, I didn't. Wait, wait. All of the reporters say, that sounds anecdotal. Give us a site. Well, the AIPLA does a survey every couple years, and they come up with those statistics, and they show that the cost of litigation goes up when the amount in controversy goes up. And here we have a very solid effect, a very real effect, where Nettalk used the $200 million claim to assert against the estate of the individual defendant in this case, the former CEO. And that prevented distribution of the estate proceeds. So it had a very real effect on this case, not just a hypothetical one. And that claim itself was suspect. Why did that have an effect on this case, as opposed to the estate case? Well, it drove a wedge between the defendants, because the individual defendant would have been trying to get the case disposed of so that they could proceed with the estate. Wait, wait, wait. Would have, or did? Well, would have, but we don't know, because the case was disposed of. So what we're saying is that's speculative. We're not saying that's speculative, Your Honor. It did drive a wedge between the defendants in the case, and it did withhold— What evidence of that is there in the record? The evidence in the—well, there isn't, Your Honor. One of the things that you claim is that Nettock eventually didn't proceed with the lawsuit because it was completely baseless. I'm sorry? One of the things you say is eventually Nettock recognized that its claims were completely baseless. It did eventually. Eventually. Eventually, yes. But when—in December 2014, MagicJack asked Nettock to discontinue the lawsuit. And it says, we want a bond posted if you continue, and we want a bond because you're financially insolvent. I think the language is Nettock would become insolvent by the time this matter is resolved. Now, isn't it at least as likely that Nettock didn't proceed because it was broke? No, Your Honor, because Mr. McAndrews at the status conference said to the court that they could not win on infringement under the court's claim construction. So he conceded that they couldn't win. It wasn't because they were broke. And they could have, if they were truly broke and wanted to dispose of the case, they could have withdrawn the $200 million claim so that the estate could proceed. They could have told the court that we're not going to proceed with this case, and let's not have to bother with discovery or expert reports or remaining trial prep and let us just wind down this case. Instead, it proposed a schedule that required Natchezack to continue as if this is a $200 million case and continue with discovery throughout the period of time until the very last minute when Nettock finally dismissed the case of its own accord. And so instead of acting in good faith, they required us to get ready for these depositions, cancel them at the last moment, required us to prepare expert reports. How much of what you're now describing took place between the December 1st, 2014 claim construction order and the final dismissal on February 27th? It spanned both periods, Your Honor. It started at the beginning of the case, and it went through, even through until the end of the case. There was never any letup. What's the breakdown? The breakdown. How much of the $2 million in fees? I don't have that detail, Your Honor. I'm sure it was heavily proportioned around the time before dismissal of the case, probably before January, although I know we did proceed with trying to finish up the depositions because Nettock would refuse to relent on its claim of damages or its claim in total. And we were facing deadlines. We had no choice but to proceed, and we did a number of times where we noticed depositions. They canceled them at the last minute. And that behavior both was before the claim construction and after. What was the basis for your $14,000 in cost? How was it broken down, just in general? I believe it was based on production costs, I believe, and it was deposition costs and transcripts. That's not something that's on appeal at this point, Your Honor. No, I didn't think it was. My interest is its proportion in relation to $2 million in fees. Well, a lot of the fees were incurred in preparing for depositions that never occurred because Nettock canceled them at the last minute. Well, right after we've already invested in the prep for both taking depositions of their witnesses and in preparing our witnesses. And in that case as well, Nettock never took any technical witnesses' depositions or even noticed them of our client. Why? Because Mr. Paxonos had already tested the accused device back in 2012, and they knew that it could not meet the Internet connection provided by the ATA limitation. We didn't find that out until we took Mr. Paxonos' deposition in late 2014, around November, I believe. And at that point, we asked them to dismiss the case. They wouldn't. The claim construction order issued, and then we asked them to dismiss the case, and they wouldn't. And then they continued throughout January and February, and they never withdrew their $200 million claim. Can I just double-check something? You didn't go to the district court after the December 1, 2014, claim construction order and say, there are a bunch of discovery deadlines coming up. There's a lot of work that's going to have to take place in the next couple of months. It sure looks like this case has to be dismissed. Can you suspend the schedule? We couldn't suspend the schedule. We didn't want to suspend the schedule because Nettock wouldn't relinquish its claim. And we felt that we had to go forward because MagicJack was a public company. It had a $200 million claim that was sitting out there that was public record because Nettock filed that in the estate and said it was based on this litigation. And so we had no choice but to continue to press forward. And instead of relenting, as I said, Nettock continued to press its claims, continued to ask for more deadlines for discovery and trial instead of doing what it should have done, which is dismiss the case. Eventually it did, but that was way too late. Again, the district court found that the internet connection provided by the ATA was not the subject of claim construction. It found that Mr. Paxinos tested the device in 2012, confirmed it was a sound card, which meant that it did not have an internet connection provided by the ATA. And that Nettock never addressed this limitation in the court below. The district court weighed it only to say that it was standing alone, not enough, and then recited the totality of circumstances test without actually adding it to the rest of the conduct. Can you remind me, why do you think that your analog telephone adapter doesn't provide an interconnection? It doesn't. Well, first of all... I want to understand that if you can quickly give me the technical details so that I might understand whether those words alone without a claim construction make it so clear that they couldn't... The claim language is an internet connection, not just a connection. But what does provide mean? Well, we don't have any expert testimony by Nettock, and they never explain how it doesn't provide it. Tell me if this is wrong. I kind of understood that if you divide this case, put aside the damages question, which I know you don't want to do, but divide it between December 1st, 2014, before and after. And before, the question is, was it clear enough before the December 1st claim construction that they absolutely couldn't win, that it was just irresponsible for them to proceed? And the December 1st claim construction was not on this element. It was on another element. So as to this element, your theory must be the words alone of the claim, unconstrued, and I gather not even the subject of a request of claim construction... That's right. ...make it really, really clear, should have made it really, really clear to them that the accused product wouldn't satisfy it. And I guess I want to understand, why is that so clear? Because the literal words say that the ATA has to provide the internet connection. It's not just provide any connection. Well, I guess, let me, I'm not sure what providing means. So can you translate that into the technical thing going on here? It means that it has to, in technical terms, it's as Mr. Paxson has admitted, which is that a sound card, which is what our device is, passes no internet formatted packets. And that talk never came back and said, Oh, no, in this world, providing means just providing any kind of connection. They never said this at all. They never addressed this in the court below. The only time they addressed it is on appeal, and that's too late. It's been waived. The time to have addressed this was either on claim construction or in opposition to our fee motion. Just so you know, you're in your rebuttal time. I'm sorry, Your Honor. No, that's up to you. I, well, in that case, I'd like to reserve my time for rebuttal. Morning, Your Honors.  Your Honor, under the highly deferential standard. Was your internet connection provided by the ATA argument presented to the district court? Your opposing counsel said no. It was during the two-hour oral argument between, before Magistrate Judge Turnoff down in Miami. He had a lot of questions about that, and we actually had samples. Oral argument on what motion? At what stage? I'm sorry, Your Honor. On the 285 fee petition. One of the points that I would have made on the time and attention that the district court, both the magistrate in reaching a report and recommendation, and then the district court in conducting a de novo review. They put an awful lot of time and attention into this matter. I brought my four client representatives. Magistrate Turnoff introduced himself and met the client. I thought that it was important that he see the people that were accused of these bad faith litigation tactics. Judge Turano asked my colleague a good question about whether or not the ATA provides an internet connection. Just by way of brief analogy, this is an iPhone. A lot of people have Samsung Galaxies. But we all know what smartphones are. This phone can have and it can facilitate an access to the internet, internet access connection, simply through one of the hot spots that the Court of Appeals for the Federal Circuit has. I'm sure that all your honors may have tablets. You certainly have smartphones. And when you're on the premises, the phone isn't what's facilitating the connection. It is indirectly. When me or my colleague, Mr. Wallenberg, pull up a patent or an opinion, the phone is part of the connection, but it's that access point that has an ethernet cable that's plugged into it. That was a good faith argument. That was an argument that was made through and through, and Judge Turnoff had a lot of pointed questions about that. It went to the heart of the issue. But the issue in dispute, going back, Your Honor, to your questions about the timing, this all started on December 1st, 2015. This is a case about a bad claim construction. It happens... I'm sorry, Your Honor. It was 2014. I'm doing the math in my head. That's absolutely right. December 1st of 2014. It was a negative claim construction. My clients didn't like it. I didn't like it, but I didn't get to know about it because, at the time, NetTalk didn't have counsel. We're heading into the holiday season. It's December 1st. Judge Gales graciously gave my client a month until the new year to retain new counsel. And on January 1st, my local counsel, Matt Tucker, down in Miami, and I signed on with these very wonderful folks from NetTalk. On Saturday, January 10th, I was on the phone for the first time introducing myself to my colleague, Mr. Wuhl. And the first thing I said is, let's talk about stipulating to dismissal an entry of judgment of non-infringement. My thought at the time, I was still reviewing the record. I had just been hired. Let's take a look at the non-infringement issue. Does it make sense then to appeal? Unfortunately, just about three weeks after that, I went in for cervical spine surgery, and that interrupted our march toward getting this case resolved and dismissed, unfortunately. I said at the time, I think I said it in the records and the submissions, I have never in 23 years of practice encountered a defendant who wanted less to be dismissed from a case than I find in the instance of MagicJack. I asked for a stipulation for a 30-day stay pending my surgery and my recovery, which is actually a pretty quick recovery for cervical spine. They denied that. I had to go to Judge Gales, and he granted the 30-day extension. And I think your honors will see from the timeline, from the time that that negative claim construction came down, where it was clear to me there could not be infringement under the court's instruction. Mr. Rueh is correct. I conceded that point. It took me a while to familiarize myself with the record, the arguments that had been made, the party's briefing, the lengthy oral argument transcript, not on the 285 hearing, but earlier on the claim construction. Was there discussion in the period after December 1st, 2014, about two different kinds of judgments that would result from a conclusion that you can't win under that claim construction? One is dismiss the case. The other is judgment for them, but you have a right to appeal the claim construction. There were, your honor, but it was seriatim in this order. The first thing I proposed to Mr. Rueh was the concept of a dismissal, a stipulation of non-infringement with the thought that we would then appeal. We would have the right to appeal, which, by the way, we point out in our submissions. We could have appealed in good faith. My clients made an economic decision, counseled by their new legal team, that with all the additional language added with the re-exam, I think your honors have seen that in the record, that's all the text that appears in the italics, let's focus on our claims that are still in prosecution at the Patent and Trademark Office. And just on, that proved to be fruitful, in fact. That's what we counseled our clients. We ultimately dismissed the case. Let me clarify something just from when I talked to Mr. Rueh. You came in January 1st. I did. January 10th, you went in for surgery? I'm sorry. January 28th, I went in. January 10th, on Saturday, I know it was a Saturday, I was at my brother's house. He's like, what are you doing on the phone? I said, well, I'm introducing myself to my new opponent. Did you ask for that extension at that point? I didn't ask in my first call with Mr. Rueh on Saturday. I did not. Do you know when you did? It certainly would have been in the ensuing seven-day period. And the record will bear this out. I know we have the docket sheet here. I can take a look. That's all right. Because I ultimately moved the court. And during the telephonic status, I asked Judge Gales if he would grant me 30 days under the circumstances. Right. And he did. I got out of surgery. And during the recovery period, we did our research. I said, this is a case for dismissal. We prepared a- This is the second best argument about that kind of thing that I've heard. When I was at the Court of International Trade, I had counsel who said, I went in for minor surgery and I fully expected to take care of this on Monday morning. Unfortunately, I was in a coma for five months. Well, Judge Wallach, what can I do to make it the best argument? It's not a competition. You don't want to compete for that award. No, of course it's not. But look, particularly when we're talking about 285 and we still have the vestiges of Brooks Furniture and the cloud of bad faith, right, and willful conduct, the conduct of the parties and the motivations of the parties matter, but the conduct of counsel matters too. And that's a handshake. That's a two-way street. I was flabbergasted when I asked for that extension and I didn't get it. The court granted it. Can I take you back to the pre-December 1, 2014 world, which I know is a- Sure. talk a little bit about the interconnection provided by the analog telephone adapter. As I understand it, MagicJack's point is it is self-evident that for that to be so, the analog telephone adapter has to have Internet-formatted packets pass through it. Try to correct me if I've misunderstood. And that it's perfectly clear that the accused MagicJack device doesn't have Internet-formatted packets pass through it. And that I think their theory or their argument is you never had any ground for, any reasonable ground for having a different understanding of what it means to provide an Internet connection. Sure. So if I understand you, Judge Toronto, you're characterizing MagicJack's argument with respect to the Internet packet. So the Internet packet issue, that claim phrase, if you will- Well, packet's not in the claim phrase. That's exactly right. What I'm saying is where that came from, that emerged out of Mr. Paxsono's, Gary Paxsono's, deposition because he acknowledged. He's an engineer. He's a software guy. He said, no, there are no Internet packets exchanged back and forth. But the legal team and my team, when we looked at it, said, that's not a claim requirement. That constricts the scope of the claim far too much. Again, it goes back to the general concept that if you have- In the course of discovery leading up to December 1st, 2014, did you have what evidence, if any, experts or otherwise or contentions or anything that said in order for a device, this device, the accused device, to provide an interconnection, it does not have to have Internet packets? Sure. So not during the claim construction process because this was not a claim that was construed. Neither side requested a construction? No. This is an argument that arose out of a fundamental dispute that we see in every patent case. What about infringement on the plain language of the claim itself? NetTalk has always maintained, long before I came along, and I can tell you, when I came along, it had been their position because that was something I wanted to know. Is this, does this facilitate an Internet connection? And they said, of course it does. It's indirect. The claim language itself, the lengthy claim language, goes on to talk about the fact and the functionality of an indirect claim. So I think one of the things we said in our brief submission to the court is that under their proposed construction, even though it's not a construction, their argument of this Internet packet thing, the claim on its face wouldn't make any sense because when you get to the portion in the claim that talks about indirect Internet connection, and let me give a more tangible example of that. If my phone is speaking to that access point, the access point has an Ethernet cable plugged into it. That's plugged into a switch in a router and it goes off to the Internet service provider, that access point, the Wi-Fi access point, is facilitating the Internet connection, but without this, my colleague and I can't, this is a necessary part of facilitating the Internet connection to the user. I mean, it's not even a strained argument, let alone a bad faith argument, and it had always been their position. And perhaps in the clarity of hindsight, Your Honor, maybe it's something that the party should have crystallized on claim construction. But I, and what I believe and what I felt when I reviewed it doesn't matter. I think what matters is how the district court assessed this very, very voluminous record over the course of several years. As we mentioned in our submission, Judge Gales himself presided over the several hours of claim construction. Can I, we haven't talked about the damages claim, and I guess I had two, it seems to me there are two possible issues with that. One is how could it conceivably be the case that when you add this number of words with, and the patent office is not doing that idly, that there was in this case, any meaningful question, that there was a substantive difference, and so damages couldn't reach back further. And then the other is what Mr. Wu was talking about, which is that it has to be the case, doesn't it, that the behavior of his side as a litigant is affected by what's at stake, the amounts at stake, by an order of magnitude. You know, an interesting point on that. I don't agree with that. I've been doing this 23 years, not 40 years, but my experience has been that there is . . . Why are you looking at Judge Toronto when you say not 40 years? Well, he had asked the question. I'll work on my eye contact. He meant collectively. So in my experience, there is some degree of proportionality, but I think that we are risking, to some of the comments Judge Wallach made, we're running the risk of wading into this circumstantial territory, something the court counseled against just on the 23rd in the Max Planck case. You were on the panel on the opinion. That's what we're talking about here. I mean, my colleague is citing APLA, the report of economic survey statistics. If they're part of the record, they're certainly not . . . We've seen it. Yeah, okay. Those are convenient stats that suggest that there is some degree of proportionality. I would certainly concede that. I would also say . . . You're over your time, so . . . I'm sorry. I am over my time. It's running out now. So on the issue of damages that I didn't really get to speak to, had the case continued, we were heading into the expert stage. I can tell you from experience working with experts, that's where you hone down and you refine your damages theory. But in this case, I don't think there is any support for the proposition that there is proportionality of the type that my colleague, Mr. Wu, was talking about here. And I think if we look at the billing records, it would bear out that everything was . . . The vast majority of this billable time was pre-holiday season, pre-my surgery, before Judge Gales came out with his claim construction.  Thank you, Your Honors. The only thing that . . . Mr. Wu. Yes. What would that 30-day stipulation have cost your client? Why didn't you grant it? We didn't grant it because they wouldn't remove their $200 million claim. That had to do . . . That $200 million claim was directly related to your opposing counsel having surgery? No. You know a barrel when you see a lawyer over it? No, Your Honor. That is not the reason. They had opportunity . . . First of all, they chose Mr. McAndrews knowing that he had that surgery coming up. They also had local counsel who also . . . Where's that in the record? It's not, Your Honor. They knew that they must have known. People don't schedule surgeries the next day. At any rate . . . Also, NETOC continued to want to press this case forward. Again, Mr. McAndrews says that they would have put it off, but they didn't put it off. They insisted on a schedule. They did put it off. They got a 30-day extension. They did, and then they kept on going. They provided a schedule that had us having to do depositions and expert reports and everything else. Without any real intent of going forward, they could have . . . If they knew at that point, they could have just said, We're not going to do this. People don't walk away from $200 million claims when they can get contingent fee counsel, when appeals aren't that expensive, if they really had met merit to their claims. But that's exactly what they did. The only thing that they ever . . . Did you deny your opposing counsel's discussion of his initial conversation with you in early January? He said he was thinking about it, but thinking and doing are two different things. In the meantime, we were all on a tight schedule to get the case to trial. The only thing he said in the case below was that the accused product facilitated an Internet connection, but the claim languages provide an Internet connection. Mr. Paxnos even admitted that that was different. Wait a minute now. Isn't it in the interest of your client, when opposing counsel says, I'm thinking about dismissing, Isn't it in your client's interest to say, Hey, let's hold off spending any more of your money? We tried to do that, and then instead they came back and said, Let's go forward with these depositions. We're not going to dismiss the case. We're not going to withdraw a $200 million claim. The district court was supposed to weigh exceptionality under the preponderance standard. I'm going to let you run over for a minute, since I let your opposing counsel watch the clock. As to non-infringement, we showed that the Internet connection provided by the ATA limitation was not met, tipping the scales toward MagicJack. NetTalk never addressed this below, so it couldn't have tipped the scales back the other way. As to the damages claim, we showed how it was meritless. They never said anything about it in the court below, or even in this court, so the scales could not have tipped back the other way. As to the litigation misconduct, we showed how they canceled depositions at the last minute, both as to their witnesses and ours, how they did the same thing on expert reports. They never refuted those facts, but just pointed to what happened later. But the conduct started at the beginning. They were doing this throughout the case. Under the preponderance standard, everything tipped MagicJack's way. NetTalk did nothing to try and tip it back. The district court abused its discretion by failing to find an exceptional case. Even on appeal, they haven't justified it. Last sentence. Last sentence. Your Honor, again, they could have adopted a schedule for remaining discovery that dispensed with the need for taking more depositions or expert reports. They didn't do that. They instead waited until the last minute on each one, and then finally tanked the case at the very end on a walk-away basis with no right of appeal. People don't do that if they have a $200 million claim. There was a period there. Thank you, Your Honor. Thank you, counsel. Matter stands submitted.